**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

————————————————————————

SHAWN MURRAY-SIMS,

     Plaintiff,

v.

NEW JERSEY TRANSIT CORPORATION,
et al.,

     Defendants.

------------------------------------------------

**Civil Action No. 12-1821 (JAD)**

**AMENDED AND**
**SUPERSEDING OPINION**

**JOSEPH A. DICKSON, U.S.M.J.**

     This matter comes before the Court upon Defendants William Avery, Joseph Meade and New Jersey Transit Corporation's ("NJ Transit") Motion for Summary Judgment. (ECF No. 44). With the parties' consent, the Hon. Kevin McKnulty, U.S.D.J. authorized this Court to "conduct all proceedings and order the entry of a final judgment in accordance with 28 U.S.C. § 636(c) and Fed. R Civ. P. 73." (ECF No. 28). The Court conducted oral argument on Defendants' motion on May 18, 2014. (ECF No. 64). Upon consideration of the parties' submissions and arguments, and for the reasons stated below, the Court grants summary judgment in favor of Plaintiff with respect to a portion of the First Count of her Second Amended Complaint, and will vacate the February 8, 2012 award that the Special Board of Adjustment No. 1043 made with regard to Plaintiff Shawn Murray-Sims. The Court grants summary judgment in favor of Defendants Avery, Meade and NJ Transit with respect to the balance of Plaintiff's claims.

## I.     <u>INTRODUCTION</u>

Plaintiff Shawn Murray-Sims, an African-American female, began working for Defendant NJ Transit, on October 2, 2002.  (Certification of Counsel in Support of Notice of Motion for Summary Judgment, (ECF No. 44-1) ("Hirschkorn Cert."), Ex. A at 12:10-20).  Ms. Murray-Sims held the position of "Assistant Conductor" throughout her time at NJ Transit, (id. at 12:18-20), which ultimately terminated Plaintiff's employment on January 5, 2011.  (Hirschkorn Cert., Ex. F ¶ 43).  Plaintiff filed a three-count complaint against Defendants, alleging violations of the New Jersey Law Against Discrimination, claiming that Defendants conspired to effectuate the wrongful termination of her employment and contending that, because NJ Transit (among others) failed to comply with certain procedural requirements when conducting a Special Board of Adjustment hearing mandated by the Railway Labor Act, the Board's decision at that hearing must be vacated. (Sec. Am. Compl., ECF No. 32-1).  Defendants Avery, Meade and NJ Transit have now moved for summary judgment on all of Plaintiff's claims.  (ECF No. 44).

## II.     RELEVANT FACTUAL BACKGROUND[1]

### a.     Disciplinary Procedures Under the Relevant Collective Bargaining Agreement

Defendant NJ Transit hired Plaintiff Murray-Sims on October 2, 2002.  (Hirschkorn Cert., Ex. A at 12:10-20).   At all relevant times, Plaintiff worked for NJ Transit as an "Assistant Conductor."   (Id. at 12:18-20).   Plaintiff was a member of United Transportation Union (the

---

[1] These facts are taken from statements that were either expressly admitted (or deemed admitted) in the statements of undisputed material fact that the parties submitted in accordance with Local Civil Rule 56.1.  The Court has disregarded any statements in which the parties improperly included arguments or legal conclusions.  L. Civ R 56.1(a).  The Court has also included certain material facts over which there is no genuine dispute.  (i.e., situations where a party has "denied" the adversary's properly supported statement of fact, but has not cited to a certification or other portion of the record that provides evidentiary support for that denial).

The Court must note that, in submitting their respective statements of fact and responses thereto, neither party has complied with the requirements of Local Civil Rule 56.1.  Most troublingly, in response to 42 of the 272 statements of purportedly undisputed material fact, the parties chose to "neither admit nor deny" the statements at issue.  (See ECF Nos. 48-1 and 55) (28 by Plaintiff and 14 by Defendants).  That is not an acceptable response under Local Civil Rule 56.1(a) (requiring parties to respond to each statement, "indicating agreement or disagreement and, if not agreed, stating each material fact in dispute and citing to the affidavits and other documents submitted in connection with the motion."); see Maultsby v. Rih Acquisitions NJ, LLC, No. 09-4376 (NLH), 2011 U.S. Dist. LEXIS 148267, *1-2, n.1 (D.N.J. Dec. 27, 2011) (Hillman, U.S.D.J.) ("Plaintiff's statement that a material fact is neither admitted nor denied does not comply with local or Federal Rules.").  The parties have therefore shifted to the Court the burden of reviewing each of those 42 statements against the voluminous record in this matter to determine whether proper evidentiary support exists.  This defeats the very purpose of Rule 56.1 statements, which are intended to "save this court from having to drudge through deposition transcripts, expert reports, and lengthy contracts to determine the facts."   Comose v. N.J. Transit Rail Operations, Inc., No. 98-2345 (JHR), 2000 U.S. Dist. LEXIS 20790, *4 (D.N.J. Oct. 6, 2000) (Rodriguez, U.S.D.J.).  The parties' submissions also contain numerous instances of argumentation and multiple legal conclusions, which are expressly prohibited under Local Civil Rule 56.1(a).  Finally, with regard to their non-deposition citations, Defendants (the moving parties here) simply cites generally to entire exhibits, leaving it to the Court to comb through the cited documents to determine if they provide the suggested support.  The parties' collective, unacceptable disregard of Local Civil Rule 56.1 has exponentially increased the burden upon the Court in this case.  Indeed, the parties' submissions were such that, if not for the age of this case, the Court would have terminated the motion and directed the parties to try again.

"Union") during her employment with NJ Transit.  (Hirschkorn Cert., Ex. F, ¶ 4).  Upon her hire, Plaintiff received a copy of the collective bargaining agreement between NJ Transit and the Union ("the Agreement"), which, among other things, establishes a required protocol for rendering and appealing disciplinary decisions.  (Hirschkorn Cert., Ex. F ¶ 14; Ex. G at 78-83).

For instance, in accordance with Rule 43 of the Agreement, NJ Transit must provide Union member employees with written notice of all disciplinary hearings (also referred to as "investigations") and of any disciplinary actions that NJ Transit takes against the employees. (Hirschkorn Cert., Ex. F ¶ 14; Ex. G at 78-80).  A Union member employee may accept discipline for a charged offense by signing a written waiver of his/her right to an initial hearing.  (Hirschkorn Cert., Ex. F ¶ 17).  If however, the employee rejects a proffered waiver, he/she is entitled to a disciplinary hearing (the "Initial Hearing"), which NJ Transit schedules on notice to both the employee and the Union.  (Id. ¶¶ 19-20).  More specifically, prior to an Initial Hearing, NJ Transit sends both the employee and his/her Union a notice of the hearing, known as a G-250, which lists, among other things, the offenses the employee is charged with and the witnesses that NJ Transit will present at the Initial Hearing.  (Id. ¶ 21; Hirschkorn Cert., Ex. G at 79).  A "hearing officer" presides over the Initial Hearing, (Hirschkorn Cert., Ex. F ¶ 26), during which NJ Transit, the employee and his/her Union present evidence and testimony on the charge at issue.  (Id. ¶ 23).  As NJ Transit does not have the authority to subpoena witnesses to appear at the Initial Hearing, (id. ¶ 39), witnesses commonly testify (and are cross-examined) telephonically.  (Id. ¶¶ 24-25). Following the Initial Hearing, a "reviewing officer" reviews the transcript of the proceedings as well as all evidence presented therein and renders a decision on the charges.  (Id. ¶¶ 27-28).

If an employee wishes to appeal the reviewing officer's determination, he/she must do so, in writing, to NJ Transit's Manager of Labor Relations.  (Id. ¶ 29).  If the employee remains

aggrieved after the Manager of Labor Relations' decision, he/she may further appeal to NJ Transit's Director of Labor Relations.  (Id. ¶ 30).  All appeals of the Director's decision must be submitted to the Special Board of Adjustment (the "Special Board"), a body created pursuant to and governed by the Railway Labor Act, 45 U.S.C. § 153 ("RLA").  (Id. ¶ 31).  The three-member Special Board consists of one representative from NJ Transit, one representative from the Union, and a third-party neutral.  (Id. ¶ 32).  In considering an appeal, the Special Board may only review the evidence and testimony presented at the Initial Hearing.  (Id. ¶ 53-54).

### b.    Plaintiff's Disciplinary History at NJ Transit

#### i.    The Extra Board

In addition to her regular duties as an Assistant Conductor, Plaintiff chose to participate as a member of NJ Transit's "Extra Board."  (Id. ¶ 6).  In that role, Plaintiff was on-call to fill in for other Assistant Conductors who were unable to perform their assigned duties.  (Id. ¶ 7).  Members of the Extra Board must make themselves available in the event an NJ Transit Crew Caller contacts them to cover a shift or portion thereof.  (Id. ¶ 8).  An Extra Board member's failure to answer a Crew Caller's telephone call constitutes a violation of Northeast Operating Rules Advisory Committee ("NORAC") Operating Rule T.[2]  (Id. ¶ 9).

On six separate occasions between 2005 and 2010, Plaintiff received a reprimand, deferred suspension or actual suspension for violating NORAC Operating Rule T in relation to charges that she failed to answer her phone when contacted by a Crew Caller.  (Hirschkorn Cert., Ex. I; Ex. J; Ex. K; Ex. L; Ex. M; Ex. N; Ex. O).  The record indicates that Plaintiff waived her right to a hearing and represented, in writing, that she was "guilty as charged" with regard to each of those

---

[2] NORAC's "Operating Rules" are intended to enhance railroad safety.  (Id. ¶ 58).  Plaintiff received a copy of NORAC's Operating Rules at the outset of her employment with NJ Transit. (Id. ¶ 60).

offenses.  (Hirschkorn Cert., Ex. I; Ex. J; Ex. K; Ex. L; Ex. M; Ex. N; Ex. O).  Plaintiff testified that she signed those waivers at the direction of her Union, (Hirschkorn Cert., Ex. A at 81:16-20), which she "always trusted" to represent her.  (Pl. Ex. 1 at 82:6-21).  Plaintiff also received a deferred suspension for violating NORAC Operating Rule T for allegedly refusing an assignment in July 2006.  (Hirschkorn Cert., Ex. I).  It appears that Plaintiff did not expressly waive her right to a hearing on that charge, and that NJ Transit determined her guilt after conducting an investigation (i.e., a hearing) in absentia.  (Id.).

### ii.  **Miscellaneous Discipline**

Plaintiff's employment file provides that NJ Transit also disciplined her (with either deferred or actual suspensions) for "marking off" from work on multiple occasions, and for violating NORAC Operating Rules 104(a) and 104(g) in connection with an incident in which Plaintiff "threw a wrong switch and directed the equipment through it causing damage to the switch and a derailment of two cars."  (Id.).

### iii.  **The Paystub Incident**

### A.  **The Alleged, Underlying Event**

Former Defendant Erie Lackawanna Credit Union (the "Credit Union") provides banking services for the benefit of NJ Transit employees.  (Hirschkorn Cert., Ex. DD at 1-2).  While the Credit Union and NJ Transit have no direct contractual relationship, NJ Transit employees may complete a form with the Credit Union authorizing NJ Transit to deduct a portion of the employee's paycheck and then electronically submit that withheld amount to the Credit Union.  (Hirschkorn Cert., Ex. DD at 1-2; Ex. EE at 2).  On April 2, 2010, Plaintiff completed such a form, authorizing NJ Transit to withhold $225.00 from each of her paychecks and to send those funds to the Credit Union to repay a previous loan.  (Hirschkorn Cert., Ex. FF).

Plaintiff sought another loan from the Credit Union in November 2010, and Henry Slootmaker ("Mr. Slootmaker"), the Credit Union's Operations Manager, requested that Plaintiff submit recent paystubs as part of the loan application process. (Hirschkorn Cert. Ex. DD at 4; Ex. A at 29:2; 38:18). Mr. Slootmaker subsequently advised NJ Transit that Plaintiff submitted an NJ Transit paystub dated November 18, 2010 (the "Paystub") in support of her loan application. (Hirschkorn Cert., Ex. DD at 4; Ex. II at 5). The Paystub contained Plaintiff's name and employee number. (Hirschkorn Cert., Ex. HH). On or about November 19, 2010, Mr. Slootmaker contacted Patrice Manning (the NJ Transit employee responsible for payroll deductions) to ask why the Paystub did not reflect the $225 deduction discussed above. (Hirschkorn Cert., Ex. DD at 4). Mr. Slootmaker had not previously discussed Plaintiff with any NJ Transit employee prior to his November 19, 2010 communication with Patrice Manning. (Hirschkorn Cert., Ex. DD at 6). Ms. Manning obtained a copy of the Paystub from Slootmaker, (id. at 5), and then showed it to Defendant William Avery, the Manager of Payroll for NJ Transit. (Hirschkorn Cert., Ex. II at 5; Ex. GG at 10:16-23, 27:8).

On or about November 29, 2010, Mr. Avery contacted Mr. Slootmaker at the Credit Union to inquire about how Mr. Slootmaker obtained the Paystub. (Hirschkorn Cert., Ex. II at 5). At that time, Mr. Slootmaker advised that Plaintiff submitted the Paystub in connection with her loan application. (Id.; Pl. Ex. 3 at 44:6-45:1). After examining the Paystub, Mr. Avery, who did not know Plaintiff, (Hirschkorn Cert., Ex. GG at 47:19), concluded that it was not authentic, as the check number and year-to-date gross wages listed were erroneously high and the number of remaining vacation days listed exceeded the number that Plaintiff actually had left. (Id. at 21:5-23, 30:10-23). Mr. Avery contacted NJ Transit's Labor Relations department and advised them of the situation. (Id. at 29:5; Hirschkorn Cert., Ex. II at 6).

Thereafter, NJ Transit General Superintendent Angel Soto instructed Assistant Superintendent Luke Maczynski to meet with Plaintiff, request that she provide a written statement regarding the Paystub, and, if she refused to cooperate, to remove her from service.  (Hirschkorn Cert., Ex. II at 7-8).  Mr. Maczynski met with Plaintiff on December 3, 2010, provided her with a copy of the Paystub and requested that she provide written responses to inquiries regarding the Paystub.  (Id.).  Plaintiff refused to provide a statement at that time,[3] and Mr. Maczynski removed her from service and charged her with a violation of NORAC Operating Rule D-Dishonesty (the "Charge").  (Id. at 7-9).

## B.   The Initial Hearing

NJ Transit scheduled a formal hearing regarding the Charge, on notice to Plaintiff. (Hirschkorn Cert., Ex. JJ; KK).  NJ Transit conducted that Initial Hearing on December 21, 2010, with Mr. Harry Woodruff serving as the hearing officer.  (See generally Hirschkorn Cert., Ex. II). NJ Transit had the hearing recorded and transcribed.  (Id.).  Plaintiff personally attended the hearing, during which she was represented by Mr. Stanley Gaskin, a Union representative.  (Id.).

Mr. Maczynski and Defendant Avery testified on behalf of NJ Transit at the Initial Hearing and Plaintiff testified on her own behalf.  (Id.).  Following Plaintiff's testimony, Woodruff called Mr. Slootmaker (misidentified in the transcript as "Henry Baker" or "Mr. Henry"), (Hirschkorn Cert., Ex. F ¶ 42), to provide testimony by telephone.  (See generally Hirschkorn Cert., Ex. II). Mr. Gaskin objected to Mr. Slootmaker's testimony, as NJ Transit did not disclose Mr. Slootmaker on its witness list.  (Id. at 6).  Mr. Woodruff overruled that objection, (id. at 6, 14-15), finding that, in light of the irreconcilable factual differences in Mr. Avery and Plaintiff's testimony (i.e.,

---

[3] Plaintiff has vehemently disclaimed any knowledge of the Paystub.  (Id. at 8).  Whether Plaintiff did or did not actually submit the Paystub to the Credit Union does not present a genuine issue of material fact for the purpose of this motion.

regarding <u>how</u> Mr. Slootmaker obtained the Paystub), Mr. Slootmaker's testimony was necessary "to have a fair and impartial Hearing."  (<u>Id.</u> at 15).  Mr. Slootmaker then testified, in pertinent part, that Plaintiff "definitely . . . hand delivered the auto loan application with [the Paystub] to the Credit Union here."  (<u>Id.</u> at 16).  Both Plaintiff and Mr. Gaskin cross-examined Mr. Slootmaker, during which time Mr. Slootmaker explained that, while Plaintiff did bring two other pay stubs with her to the Credit Union, one (dated September 2010) was too old to serve as the basis for her loan application and the other was from her daughter (who was not a cosignor for the loan in question and had submitted a separate loan application).  (<u>Id.</u> at 17-19).  Accordingly, the Credit Union's board only reviewed the Paystub in connection with Plaintiff's application.  (<u>Id.</u> at 18). With regard to his motivation for contacting NJ Transit about the Paystub, Mr. Slootmaker testified:

> [Plaintiff] had been late on . . . like three (3) months in a row on her regular loan payment because it hasn't been deducted on her check and the board denied her application and then ask [sic] me why they're not deducting from her check what [sic] she's suppose supposed to be having $225 deducted a week from her check and that would eliminate the delinquency on her loan.  So, they asked me to contact payroll to find out.  Patrice [Manning] was stopping by to do some of [sic] transactions on her own accounts.  So, I gave her a copy of the [P]aystub that was presented to me.  I gave her a copy of that showing that the deduction wasn't made and asked her to look into it thinking it was an error in the system and then she came back saying that she . . . there's no record of that [P]aystub anyway in the TRANSIT payroll system.  So that's when Mr. Avery got in contact with me.

(<u>Id.</u> at 15-16).  Neither Plaintiff nor Mr. Gaskin sought to adjourn the proceedings to have Mr. Slootmaker testify in person, to more fully prepare for his cross-examination, or for any other reason.  (<u>See generally</u> <u>id.</u>).   Plaintiff continued to disclaim any knowledge of the Paystub.  (<u>Id.</u> at 18).  Defendant Joseph Meade, a General Superintendent for NJ Transit, served as the review

officer for Plaintiff's initial hearing.   (Id. at 1).   After reviewing the transcript and evidence presented at the hearing, Mr. Meade terminated Plaintiff's employment with NJ Transit on January 5, 2011.  (Hirschkorn Cert., Ex. F ¶ 43).

### C.        Plaintiff's Appeal to the Special Board of Adjustment

In accordance with the protocol discussed in Section II(a) above, Plaintiff appealed Mr. Meade's decision to the then-Manager of Labor Relations for NJ Transit's Rail Operations, Stephen Drayzen.  (Id. ¶ 44).  On February 3, 2011, Mr. Drayzen upheld Plaintiff's termination in a written decision.  (Id. ¶  45).  Plaintiff then appealed Mr. Drayzen's decision to Agnes Duncan, NJ Transit's Director of Labor Relations, who also upheld Plaintiff's termination.   (Id. ¶ 46). Plaintiff subsequently appealed her termination to the Special Board of Adjustment No. 1043, which is the board designated to hear disciplinary matters involving NJ Transit's Trainmen.[4]  (Id. ¶¶ 47-48).

With regard to Plaintiff's appeal, the Special Board was composed of Mr. Patrick Reilly (the General Chairman of Plaintiff's Union), Mr. William Murphy (a representative of NJ Transit), and Mr. Marty Zusman (the Chairman and neutral member).  (Hirschkorn Cert., Ex. F ¶ 49; Ex. LL).  Plaintiff called her Union representative repeatedly following her termination to determine when the Board would conduct its hearing.  (Pl. Ex. 1 at 60:15-61:6).  On or about June 7, 2011, Mr. Reilly, on behalf of the Special Board, sent Plaintiff a letter, via certified mail only, advising her that the Special Board would hear her case at 10:00 a.m. on July 25, 2011, and enclosing drafts of the submissions that the Union planned to provide to the Special Board on Plaintiff's behalf.

---

[4] NJ Transit defines the term "Trainmen" as "Conductors, Assistant Conductors and Ticket Collectors."  (Hirschkorn Cert., Ex. P ¶ 5).

(Hirschkorn Cert., Ex. MM).  The letter stated, in pertinent part, that Plaintiff's attendance was "requested, but not mandatory."  (Id.).

When the Special Board convened the hearing on July 25, 2011, Plaintiff was not in attendance.  (Hirschkorn Cert., Ex. LL).  On or about July 26, 2011, the United States Postal Service returned the Special Board's June 7, 2011 letter as "unclaimed."  (Hirschkorn Cert., Ex. NN).  The Special Board subsequently issued a written decision rejecting Plaintiff's procedural arguments and upholding NJ Transit's disciplinary decision.  (Hirschkorn Cert., Ex. LL at 1-2). Plaintiff first learned about the hearing, after it had concluded, when speaking to Union representative David Sousman.  (Pl. Ex. 1 at 61:1-9)

### c.    <u>Specific Instances of Alleged Discrimination</u>

### i.    <u>Plaintiff's Training at NJ Transit</u>

At the outset of her employment with NJ Transit, Plaintiff took part in a twenty-eight (28) day training program.  (Hirschkorn Cert., Ex. A at 55:6).  NJ Transit did not want its trainees to work at other jobs during that program, as it wished to ensure that those employees had a "required amount of rest."  (Id. at 55:5-16).  Nevertheless, during her training period, Plaintiff also worked the night shift as a Police Aide for the Newark Police Department.  (Id. at 55:16).  Plaintiff would sometimes close her eyes during her training at NJ Transit.  (Id. at 55:18-20).  Believing that she had fallen asleep, her instructor, Allen Antell, repeatedly came over to where Plaintiff was sitting, where he spoke in a raised voice and asked her questions.  (Id. at 55:18-56:3; 68:5-12).  This was an "ongoing thing" during Plaintiff's training.  (Id. at 56:2-3).

### ii.    <u>Interactions with Pat Carroll</u>

As part of the testing process for becoming a conductor, Plaintiff was required to draw certain maps.  (Id. at 66:4-6).  NJ Transit employee Pat Carroll repeatedly gave Plaintiff a failing

grade for those maps.  (Id. at 66:9-11).  Per Plaintiff's request, another train master later reviewed some or all of Plaintiff's maps, gave her a passing score, and remarked that he did not know why Pat Carroll would have failed Plaintiff with regard to those maps.  (Id. at 66:11-21).  There is no evidence in the record regarding how Ms. Carroll scored other employees on such map tests.

Plaintiff also testified about an incident in which Pat Carroll yelled at Plaintiff (who was setting up inside the train) for not being out on the platform "ten minutes prior" despite the fact that the "conductor" was "two cars up, eating."  (Id. at 66:22-67:8).  There is no evidence in the record with regard to that conductor's race.

Plaintiff further testified that Pat Carroll "came out and talked to [Plaintiff] on the platform in a detailed tone about [Plaintiff] not having [her] tie correct . . . [and for having her hat] tilted to the side."  (Id. at 123:22-124:3).  Plaintiff was not charged with any infraction, let alone formally disciplined regarding her uniform.  (Id. at 123:22-24).  As a basis for comparison, Plaintiff testified that Caucasian employee William Warwick brought his dog to work on one occasion.  (Id. at 123:11-21).  Plaintiff has not identified anything in the record suggesting whether Mr. Warwick was disciplined for such conduct (or if it is even a violation of any NJ Transit or NORAC rule).

### iii.  Extra Board Discipline

Plaintiff alleges that NJ Transit discriminated against her when it disciplined her in connection with her violations of NORAC Operating Rule T (i.e., not answering a Crew Caller's telephone calls regarding the Extra Board).  She states that NJ Transit did not discipline William Bennett, a Caucasian Assistant Conductor, for missing assignment calls.  (Id. at 117:8-118:23).  She could not, however, provide any specifics with regard to Mr. Bennett's alleged conduct and further admitted that her knowledge of Mr. Bennett's disciplinary record was based solely on Mr. Bennett's single, vague statement.  (Id. at 117:15, 132:23).  Indeed, Plaintiff has not pointed to any

evidence suggesting that Mr. Bennett was a member of the Extra Board, or that the calls he missed concerned Extra Board shifts (i.e., the infraction for which NJ Transit disciplined her). Furthermore, Plaintiff was unable to provide the names of any other Assistant Conductors who avoided disciplined for failing to answer Extra Board calls, let alone the dates of such incidents. (Id. at 118:6-9; 115:6-9).

### iv.    NJ Transit Audits

NJ Transit audits Trainmen who are responsible for handling money and tickets to ensure the accuracy of the collected revenue and to correct errors in fare collections.  (See generally Hirschkorn Cert., Ex. P).  NJ Transit's Crew Management and Operations Compliance Department ("CMOC") corrects errors in fare collection, reviews revenue collected by Trainmen to ensure accuracy and Trainmen compliance, and works in conjunction with NJ Transit's Financial Operations and Compliance Department ("FOC").  (Id. ¶¶ 3-4).  The FOC provides the CMOC with a list of Trainmen who have three or more occurrences of missing or untimely remitted fares, and those Trainmen are then subject to an audit.  (Id. ¶ 6).  An audit for a Trainman's revenue and receipts may also be scheduled in response to a passenger or third party complaint of improper fare handling.  (Id. ¶ 9).  Additionally, any Trainmen who repeatedly err in their ticket receipts are subject to an audit.  (Id. ¶ 10).  Once the FOC and CMOC determine that an employee will be audited, the CMOC reviews the Trainman's work schedule and provides the FOC with ideal times for the audit to take place.  (Id. ¶ 7).  The FOC then schedules the audit and informs CMOC of the time and location.  (Id. ¶ 8).

NJ Transit's Trainmasters conduct all audits of Trainmen receipts.  (Id. ¶ 12).  They do so by removing the Trainman from the train, taking him/her to a conference room where the Trainman is required to empty his/her pockets and provide the Trainmaster with all of the tickets, stock and

collected cash in his/her possession.  (Id. ¶ 13).  If the Trainmaster discovers a revenue violation during the audit, the Trainman is charged accordingly and has the right to appeal any charges brought as a result.  (Id. ¶¶ 14-15).

With respect to these audits, Plaintiff has testified that when her former instructor, Allen Antell, became a Trainmaster, he "used to always pull [her] off the train . . . to check [her] money and [her] tickets," and that he did so with a discriminatory intent.  (Hirschkorn Cert., Ex. A at 68:9-19).  The record is not clear as to how many times NJ Transit audited Plaintiff.  While Plaintiff argues that she was "subjected to repeated audits" and cites to specific excerpts from her deposition testimony in support of that statement, (Pl. Br., ECF No. 48-2), those citations do not provide any clarity.  First, half of the transcript pages Plaintiff cites (i.e., pages 96, 97 and 102) are not in the evidentiary record for this motion, as neither party supplied them to the Court.  Second, testimony on the three cited pages that are actually in the record (99, 100 and 101) reflects only that Plaintiff definitely remembered being audited once, on August 4, 2004.  (Pl. Ex. 1, 99:1-101:22).  The balance of those transcript pages consist of counsel mentioning two other audit dates alleged in the Complaint and asking Plaintiff to provide relevant documentation.  (Id.).  The cited testimony does not confirm that NJ Transit actually audited Plaintiff on those dates, and Plaintiff has not provided the Court with any other evidence to that effect.

The undisputed evidence of record for this matter indicates that, in 2003, NJ Transit removed approximately 17 Caucasian and approximately 7 African-American Trainmen from their trains and subjected them to audits.  (Hirschkorn Cert., Ex. C; Ex. Q).  NJ Transit audited Plaintiff in 2004, along with approximately 21 Caucasian and 15 African American Trainmen.  (Hirschkorn Cert., Ex. C; Ex. S).  In 2009, NJ Transit audited approximately 69 Caucasian and 66 African American Trainmen.  (Hirschkorn Cert., Ex. C; Ex. U).  Finally, in 2010, NJ Transit audited

14

approximately 84 Caucasian and 78 African American Trainmen.  (Hirschkorn Cert., Ex. C; Ex. V).  Nothing in the record indicates whether these numbers are proportional to the number of NJ Transit's Caucasian/African American employees.  Defendants have also provided the names of two Caucasian Assistant conductors whom NJ Transit dismissed as a result of infractions discovered during the audit process.  (Hirschkorn Cert., Ex. T; Ex. X).

### v.        The Paystub Incident

Plaintiff raises two distinct allegations of discrimination in connection with the Paystub situation described at length above.  First, Plaintiff testified that she believes that Defendant William Avery discriminated against her because of the way he handled the Paystub issue (i.e., by determining that the Paystub was fraudulent without talking to her about it).  (Hirschkorn Cert., Ex. A at 77:11-78:5).  Second, Plaintiff testified that, whereas she was terminated for an alleged violation of NORAC Rule D and not reinstated, two Caucasian employees, William Bennett[5] and Robert Broschart were terminated for either stealing (Bennett) or dishonesty (Broschart), but were subsequently reinstated.  (Hirschkorn Cert., Ex. A at 119:5-120:19).  It appears that Plaintiff's knowledge of those employees' disciplinary history was based on workplace gossip or news reports.  (Id.).  With regard to Mr. Broschart, the undisputed evidence of record establishes that, in fact, NJ Transit terminated Mr. Broschart for his conduct, and that it was the Special Board, and not NJ Transit, that reinstated him.  (Hirschkorn Cert., Ex. T).  In fact, NJ Transit filed a dissent regarding the Special Board's decision.  (Id.).  With respect to Mr. Bennett, Plaintiff's own exhibit establishes that NJ Transit terminated him for violating various rules (including NORAC Operating Rule D), and that the Board ultimately upheld that termination.  (Pl. Ex. 8).  Defendants

---

[5] Plaintiff erroneously refers to this employee as William Barnett.  (See ECF No. 48-1 ¶ 269). Plaintiff's own exhibit, however, establishes that his name is William Bennett.  (See Pl. Ex. 8).

also submitted a Board decision concerning Caucasian employee William Warwick, a Conductor (i.e., the employee who allegedly brought his dog to work). (Hirschkorn Cert., Ex. X). NJ Transit audited Mr. Warwick and determined that he had kept certain portions of the cash fares he collected. (Id. at 1). NJ Transit terminated Mr. Warwick's employment and the Special Board (composed of the same members who heard Plaintiff's case) ultimately upheld NJ Transit's determination. (Id. at 3).

### vi.    Discrimination in the Context of Plaintiff's Medical Leave

NJ Transit maintains a Medical Services Department that, among other things, provides basic medical services to employees, monitors employee health, and authorizes employee absences and returns-to-duty. (See generally Hirschkorn Cert., Ex. AA). Under its Medical Policy, NJ Transit may require an employee to report to the Medical Services Department for a physical evaluation if that employee has been unable to return to work for 30 consecutive days. (Id. at 2). An employee's failure to report for a requested examination may lead to disciplinary action, up to and including termination. (Id. at 3). On or about September 11, 2010, Plaintiff went out on medical leave for more than thirty days and, on October 7, 2010, NJ Transit sent Plaintiff a letter directing her to report to the Medical Services Department for an examination on October 15, 2010. (Hirschkorn Cert., Ex. A at 87:13; Ex. B).

Plaintiff testified as to her belief that NJ Transit discriminated against her in that it did not require her Caucasian colleagues to report to the Medical Services Department while on sick leave. (Id. at 91:1-92:6). Plaintiff based that statement on her recollection of hearing various Caucasian employees "brag" about not being ordered to report for medical evaluations. (Id. at 92:1-3). Plaintiff could not provide any specific examples of such bragging during her deposition, (id. at 92:4-6), and has not identified any in the context of this motion.

16

### vii.    Interactions with Joseph Meade

Plaintiff testified that Defendant Joseph Meade, another NJ Transit employee, discriminated against her in two respects.  First, Plaintiff testified that, despite her requests, Mr. Meade did not make time to meet with her regarding her interactions with Pat Carroll.  Rather, Mr. Meade sent her to meet with other supervisors.  (Hirschkorn Cert., Ex. A at 70:14-71:19, 76:8-12). Plaintiff has not identified any evidence regarding Mr. Meade's willingness to meet with any other NJ Transit employees.  Plaintiff also stated that Mr. Meade discriminated against her by denying her leave under the Family Medical Leave Act.  (Id. at 71:18-73:16).  The record for this motion does not contain any details regarding the FMLA denials, or whether Mr. Meade denied other employees' requests for such leave.  As Plaintiff has not cited any evidence regarding how Mr. Meade treated other employees with regard to either of these situations, there is nothing to which this Court may compare his alleged conduct.  Furthermore, nothing in the evidentiary record (independent of Mr. Meade's decisions themselves) suggests that Mr. Meade acted with a racial animus.

## III.    RELEVANT PROCEDURAL HISTORY

Plaintiff commenced this matter by filing a Complaint in the United States District Court on March 23, 2012.  (ECF No. 1).  Plaintiff filed an Amended Complaint on June 8, 2012, (ECF No. 16), and a Second Amended Complaint (in compliance with this Court's January 23, 2013 Order, (ECF No. 31)) on January 29, 2013.  (ECF No. 32-1).  The Second Amended Complaint remains Plaintiff's operative pleading in this matter.

In her Second Amended Complaint, Plaintiff asserts several distinct causes of action.  First, she contends that the Special Board's July 25, 2011 hearing was procedurally deficient in various respects, and that the Court must therefore vacate the award rendered in connection with that

hearing.  (Sec. Am. Compl., First Count, ¶¶ 19-37).  Second, Plaintiff alleges that all Defendants discriminated against her on the basis of her race, in violation of the New Jersey Law Against Discrimination ("NJLAD").  (Id. ¶¶38-53).  While Plaintiff has framed her NJLAD claims as a single cause of action, she alleges that Defendants engaged in both "disparate treatment" and "hostile work environment" subsets of discrimination.  (Id.).  Finally, Plaintiff alleges that Defendant Eerie Lackawana Credit Union conspired with its co-defendants for the purpose of effectuating the wrongful termination of Plaintiff's employment at NJ Transit.  (Id. ¶¶ 54-63).

On October 3, 2013, Plaintiff dismissed her claims against Defendant Erie Lackawanna Credit Union.  (ECF No. 43).  Since that date, NJ Transit, Mr. Avery and Mr. Meade have been the only remaining defendants in this matter.  On November 14, 2013, those defendants moved for summary judgment on all of Plaintiff's claims.  (ECF No. 44).  Plaintiff filed her opposition (but did not cross-move for summary judgment) on January 5 and 6, 2014, (ECF Nos. 48-53), and Defendants filed their reply submissions on January 17, 2014.  (ECF Nos. 54-55).  The Court conducted oral argument on May 19, 2014, and Ordered the parties to submit certain supplemental briefing.  (ECF No. 57).  The parties collectively submitted three additional letter briefs between June 6, 2014 and July 18, 2014, (ECF Nos. 58, 61, 63), at which point this matter was fully briefed.

## IV.   LEGAL STANDARD

A court shall grant summary judgment under Rule 56(c) of the Federal Rules of Civil Procedure "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  On a motion for summary judgment, the moving party must initially show that no genuine issue of material fact exists.  Celotex Corp. v. Catrett, 477 U.S. 317, 330, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The burden then shifts to the non-moving party to present evidence sufficient to demonstrate that some genuine issue of material fact necessitates a trial. Id. at 324. In so doing, the non-moving party must proffer specific facts that establish a genuine issue of material fact, not just "some metaphysical doubts as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Thus, the non-moving party may not rest upon the mere allegations or denials set forth in its pleadings. See Celotex Corp., 477 U.S. at 324. Further, the non-moving party cannot rely on unsupported assertions, bare allegations, or speculation to defeat summary judgment. See Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 252 (3d Cir. 1999). The court must, however, consider all properly established facts and their reasonable inferences in the light most favorable to the non-moving party. See Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995). If the nonmoving party "fail[s] to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof," then the moving party is entitled to judgment as a matter of law. Celotex Corp., 477 U.S. at 323.

Given the state of the evidentiary record in this matter, the Court notes that, when analyzing Defendants' motion (and Plaintiff's opposition thereto), it is constrained to rely solely on facts based on admissible evidence. See Fed. R. Civ. P. 56(c); see also Arnold Pontiac-GMC, Inc v. Budd Baer, Inc., 826 F.2d 1335, 1339 n. 3 (3rd Cir. 1987) ("Summary judgment, of course, looks only to admissible evidence."). If a purported fact is based solely on a statement that constitutes hearsay and would not be admissible at trial, a court should not consider that statement in the context of a summary judgment motion. Philbin v. Trans Union Corp., 101 F.3d 957, 961 n.1 (3rd. Cir. 1996); Blackburn v. UPS, Inc., 179 F.3d. 81, 95 (3rd. Cir. 1999). Similarly, a party opposing the summary judgment motion is not permitted to use inadmissible evidence, such as hearsay, to

establish a genuine dispute of material fact.  See Alpert v. United States, 481 F.3d 404, 409 (6th Cir. 2007).

## V.     LEGAL ANALYSIS

### a.     Plaintiff's Claims Regarding the Board Hearing

In her First Count, Plaintiff requests that the Court vacate the Special Board's February 8, 2012 award, (Hirschkorn Cert., Ex. LL), upholding NJ Transit's decision to terminate her employment.  (Sec. Am. Compl., ECF No. 32-1, ¶¶ 19-37).  The Court recognizes that the Special Board was created under the terms of the RLA, 45 U.S.C. § 153, et seq.  Before moving on to the substance of Plaintiff's arguments on this point, the Court must address the relevant provisions of the RLA, and how those provisions impact the scope of the Court's authority to vacate the Special Board's award.

45 U.S.C. § 153(i) provides, in pertinent part, that if an employee and a carrier are unable to resolve a certain disputes subject to the RLA using the carrier's internal mechanisms, either party may petition the appropriate division of the National Railroad Adjustment Board (the "National Board") for review.  The RLA further states, in pertinent part, that if any employee or carrier is aggrieved by the terms of the National Board's award, they may file an action in the United States District Court seeking review of that award.  45 U.S.C § 153(q).  The RLA expressly limits the permissible scope of the District Court's review of any National Board decision in such cases, providing:

> the findings and order of the [National Board] shall be conclusive on the parties, except that the order . . . may be set aside, in whole or in part, or remanded to the division, for failure of the [National Board] to comply with the requirements of this Act, for failure of the order conform, or confine itself, to matters within the scope of the [National Board's] jurisdiction, or for fraud or corruption by a member of the [National Board] making the order.

Id.; accord Union P. R. Co. v. Sheehan, 439 U.S. 89, 93 (1978).  Indeed, in describing the District Court's authority to review National Board decisions under 45 U.S.C. § 153(q), the United States Court of Appeals for the Third Circuit has acknowledged that "[t]he scope of this review has been described as 'among the narrowest known to the law.'"  United Steelworkers of America v. Union R. Co., 648 F.2d 905, 910 (3d Cir. 1981) (internal citation omitted).  The United Steelworkers Court ultimately determined that, "[e]ven though circumstances may seem compelling in an individual case, we are convinced that we must adhere strictly to the statutory command that [National] Board findings be set aside in only [the] three narrow sets of circumstances [set forth in the statute]."  Id. at 914.  In the event that the District Court determines that the National Board's award must be set aside, "[t]he RLA broadly empowers [the court] to provide a remedy that it deems appropriate."  United Transp. Union v. BNSF Ry. Co., 710 F.3d 915, 935 (9th Cir. 2013).  "It may remand the case back to the Board for a new untainted hearing; it may remand for a new hearing subject to various procedural or substantive limitations; it may remand allowing the Board to make its own determination as to how to proceed (including what evidence may be introduced or shall be excluded at any further hearing); or it may direct such further action by the Board as the court deems appropriate."  (Id.).

The RLA also provides that carriers (such as NJ Transit) and representatives (i.e., unions), may establish, by agreement, special adjustment boards capable of hearing cases in lieu of the National Board.  45 U.S.C. § 153 (Second).  The RLA also expressly provides that "[c]ompliance with [the awards of a special adjustment board] shall be enforceable by proceedings in the United States district courts in the same manner and subject to the same provisions that apply to proceedings for enforcement of compliance with awards of the [National Board]."  Id.  Thus, the

same standards of review and list of permissible remedies set forth in 45 U.S.C. § 153(q) and related case law would apply to decisions of a special adjustment board established under the RLA.

NJ Transit and Plaintiff's Union established the Special Board at issue in this case pursuant to Section 44 of their Agreement.  (Hirschkorn Cert., Ex. G).  The Special Board and its awards are therefore governed by the RLA, and this Court's review of any such award is limited in the fashion discussed above.  Here, Plaintiff argues that the Court must vacate the Special Board's award on two separate grounds.  First, Plaintiff contends that, because NJ Transit hearing officer Henry Woodruff permitted Eerie Lackawanna Credit Union employee Henry Slootmaker to testify at the December 21, 2010 initial hearing, and to do so by telephone rather than in-person, and because the Special Board considered Slootmaker's testimony when considering Plaintiff's appeal, the Special Board violated Plaintiff's right to due process.  (Pl. Br., ECF No. 48-2, at 32-34).  Second, Plaintiff argues that the Special Board violated the RLA (and basic notions of due process) by failing to provide Plaintiff with adequate notice of its July 25, 2011 hearing.  The Court will address each of Plaintiff's points in turn.

### i.     Plaintiff's Claim Regarding Mr. Slootmaker's Testimony

When conducting the Initial Hearing in Plaintiff's case, the NJ Transit hearing officer permitted Eerie Lackawanna Credit Union employee, Henry Slootmaker, to testify over Plaintiff's Union representative's objection.  (Hirschkorn Cert., Ex. II, at 6, 14-15).  The Union representative objected based solely on the fact that NJ Transit did not list Mr. Slootmaker on its witness list.  (Id. at 14).  Neither Plaintiff nor her representative voiced any concern about Mr. Slootmaker testifying telephonically, rather than in person.  (See generally id.).  The hearing officer then overruled that lone objection, (id. at 6, 14-15), finding that, in light of the irreconcilable factual differences in Mr. Avery and Plaintiff's testimony (i.e., regarding how Mr. Slootmaker obtained the Paystub),

Mr. Slootmaker's testimony was necessary "to have a fair and impartial Hearing." (Id. at 15). Both Plaintiff and her representative cross-examined Mr. Slootmaker telephonically. (Id. at 16-18). In rendering its February 8, 2012 award, the Special Board addressed the hearing officer's decision to permit Mr. Slootmaker's testimony: "The lack of [Mr. Slootmaker] as a listed witness was properly explained when the Claimant refuted testimony. There was nothing in the record to support any of the [Union's] arguments that merits could not be reached. The merits can be reached, as procedural errors do not exist." (Hirschkorn Cert., Ex. LL, at 1-2).[6]

Plaintiff now contends that the Special Board's consideration of Mr. Slootmaker's telephonic testimony constitutes a violation of Plaintiff's "due process rights per the United States Constitution." (Pl. Br., ECF No. 48-2, at 34). More specifically, Plaintiff claims: "Henry [Slootmaker] was allowed to testify via telephone. Plaintiff was by this process deprived of the opportunity to confront Henry, to question and cross examine him on his testimony and to watch his demeanor during this process. Thus, Plaintiff's due process rights were violated." (Id. at 33). Plaintiff makes this argument in a purely conclusory fashion, without providing a single legal citation or any meaningful analysis. (Id. at 32-34).

Assuming, without deciding, that Plaintiff did not waive her objection to the telephonic nature of Slootmaker's testimony by failing to raise it at the initial hearing, the Court declines to find any due process violation based on the undisputed facts at issue. See, e.g., Smith v. Borough of Dunmore, 516 F. App'x 194, 199 (3d Cir. 2013) ("Generally, the ultimate issue of whether due process was afforded to [a litigant is] a question of law for the court to determine.") Plaintiff has

---

[6] The Court also notes that the undisputed evidence of record for this motion suggests that, because NJ Transit does not have the authority to subpoena witnesses to appear at its disciplinary hearings, (Hirschkorn Cert., Ex. F ¶ 39), witnesses commonly testify (and are cross-examined) telephonically. (Id. ¶¶ 24-25).

not provided the Court with any authority suggesting that telephonic testimony is constitutionally impermissible in the context of in-house disciplinary hearings, and the Court has not uncovered any such authority through its independent research.  Indeed, in the most analogous case this Court was able to locate, another Court in this District rejected a claim that an administrative law judge (in a more formal setting than the private, disciplinary hearing at issue in this case) violated applicable regulations and, in turn, the plaintiff's rights, by permitting a vocational expert to testify by telephone.  Lippincott v. Comm'r of Soc. Sec., 982 F. Supp. 2d 358, 378-381 (D.N.J. 2013).  In Lippincott, the Court ultimately determined that because: (1) the plaintiff's representative did not object to the telephonic nature of the testimony; (2) the plaintiff's representative "was able to effectively and extensively cross-examine" the witness; (3) "there [were] no gaps in the transcript suggesting any technical difficulties preventing and accurate and complete understanding of [the witness'] testimony"; and (4) the plaintiff failed to identify any prejudice caused by the telephonic testimony, the administrative law judge, at most, committed harmless error (not requiring remand) by permitting the telephonic testimony.  Id. at 380-81.  The Court finds the same rationale applicable here.

The evidentiary record unequivocally demonstrates that Plaintiff was not denied an opportunity to cross-examine Mr. Slootmaker.  Rather, both she and her union representative took turns cross-examining him via telephone.  (Hirschkorn Cert., Ex. II, at 16-18).  Moreover, while Plaintiff's representative objected to the fact that Mr. Slootmaker was not listed on NJ Transit's witness list, nobody objected to the telephonic nature of Mr. Slootmaker's testimony.  (See generally id.).  Nothing in the hearing transcript indicates any "technical difficulties" that precluded a full and accurate understanding of the substance of Mr. Slootmaker's testimony, which was straightforward and limited to a single, discrete issue.  (Id. at 15-18).  Finally, outside of

Plaintiff's, vague, conclusory statement that it was "unfair to Plaintiff to allow [Mr. Slootmaker] to appear via telephone", (Pl. Br., ECF No. 48-2 at 34), Plaintiff has not provided any indication as to how the telephonic testimony may have harmed her.  As Plaintiff has not cited any legal authority in support of her claim, see Espinosa v. County of Union, No. 01-CV-3655 (WJM), 2005 U.S. Dist. LEXIS 36563, *31 (D.N.J. Aug. 30, 2005) ("Plaintiff has failed to provide any legal authority creating a claim for aiding and abetting, thus summary judgment is granted."), and analogous case law from this District suggests that Plaintiff's due process claim fails as a matter of law, the Court finds that Defendants are entitled to summary judgment on this aspect of Plaintiff's First Count.

### ii.  Plaintiff's "Due Notice" Claim

In her second argument regarding the Special Board, Plaintiff contends that the Special Board violated the RLA by failing to give her "due notice" of the hearing in her case, and that the Court must therefore vacate the Special Board's ultimate award.  (Pl. Br., ECF No. 48-2, at 22-31).  The facts relevant to this claim are straightforward and not in dispute.  Plaintiff appealed her termination to the Special Board, (Hirschkorn Cert., Ex. F ¶ 47-48), and called her Union representatives on multiple occasions to determine when the Board would hear her case.  (Pl. Ex. 1 at 60:15-61:6).  The Special Board eventually scheduled a hearing on Plaintiff's case for July 25, 2011.  On or about June 7, 2011, Mr. Patrick Reilly (a representative of Plaintiff's Union), acting on behalf of the Special Board, sent Plaintiff a letter,[7] via certified mail only, advising her that the Special Board would hear her case at 10:00 a.m. on July 25, 2011, and enclosing drafts of

---

[7] The parties agree that Plaintiff maintained the same mailing address - a post office box in Orange, New Jersey- at all times relevant to this case.  (Compare ECF No. 44-6 ¶¶ 5-7 with ECF No. 48-1 ¶¶ 5-7).  Patrick Murphy addressed his June 7, 2011 letter to that address.  (Hirschkorn Cert., Ex. MM).

the submissions that the Union planned to provide to the Special Board on Plaintiff's behalf. (Hirschkorn Cert., Ex. MM).  When the Special Board convened the hearing on July 25, 2011, Plaintiff was not in attendance.  (Hirschkorn Cert., Ex. LL).  On or about July 26, 2011, the United States Postal Service returned the Special Board's June 7, 2011 letter as "unclaimed."  (Hirschkorn Cert., Ex. NN).  Plaintiff, therefore, never actually received notice of the hearing and, in fact, only learned of it after-the-fact when speaking with a Union representative.  (Pl. Ex. 1 at 61:1-9).  The question before the Court, therefore, is whether a letter, sent to Plaintiff by certified mail only and never actually received, satisfies the RLA's notice requirements.[8]

With regard to any hearing conducted by the National Board or special adjustment boards, the RLA provides, in pertinent part:  "[p]arties may be heard either in person, by counsel, or by other representatives . . . and [the board] shall give <u>due notice</u> of all hearings to the employee . . . and the carrier . . . involved in any disputes submitted to them."  45 U.S.C § 153(First)(j) (emphasis added).  The RLA does not, however, provide any guidance regarding what constitutes "due notice" and, despite extensive briefing on the issue, which included Court-ordered supplemental briefing, (ECF Nos. 58, 61, 63), no party has cited binding authority providing a definitive answer. At most, the parties have cited case law that provides persuasive authority regarding the concept of acceptable notice in various contexts.  Among that authority, the Court finds the United States

---

[8] In an argument raised in Defendants' reply brief, NJ Transit suggests that it is not a proper party to Plaintiff's "due notice" claims, as the RLA imposes its "due notice" requirement on the Board itself, not on carriers such as NJ Transit.  (Def. Rep. Br., ECF No. 54, at 5).  NJ Transit suggests that Plaintiff should instead sue the Board.  (<u>Id.</u>).  At least one circuit of the United States Court of Appeals has determined, however, that special boards of adjustment, which operate as the functional equivalents of the National Board, are "are not proper parties to a petition for review under the RLA."  <u>Ollman v. Special Bd. of Adjustment No. 1063</u>, 527 F.3d 239, 250 (2d Cir. 2008).  Thus, it appears that NJ Transit is not only a proper party to Plaintiff's "due notice" claims, it may be the <u>only</u> proper party.

Supreme Court's opinion in <u>Jones v Flowers</u>, 547 U.S. 220 (2006), to be the most applicable given the facts of this case.

In <u>Jones</u>, the United States Supreme Court ruled, in a non-RLA context, that the Arkansas Commission of State Lands failed to provide sufficient notice of a tax sale when it sent a homeowner notice of that sale by certified mail only, and received notification, prior to conducting the tax sale, that the certified mail had gone "unclaimed." <u>Id.</u> at 238-39. The Court wrote, in pertinent part: "[i]t is not too much to insist that the State do a bit more to attempt to let [the homeowner] know about [the tax sale] when the notice letter addressed to him is returned unclaimed." <u>Id.</u> at 239. The Court did not definitely state what sort of additional steps might be necessary, but suggested (after addressing the shortcomings inherent in certified mail) that re-sending the notice by regular mail, which would not require the recipient to take any additional steps to receive it, may be sufficient. <u>Id.</u> at 234-235.

Defendants argue that the <u>Jones</u> decision is inapplicable because, unlike the Arkansas Commission of State Lands' tax sale notice, the Board's June 7, 2011 letter was not returned as "unclaimed" until <u>after</u> the Special Board conducted its July 25, 2011 hearing. (<u>See</u> Def. Br., ECF No. 63, at 1-3). This Court disagrees. That distinction would be both artificial and nonsensical in light of the current state of mail tracking technology and the evidence of record in this case. While the Postal Service did not physically return the "unclaimed" letter to the Board until the day after the hearing, Defendants' own exhibit demonstrates that the Postal Service designated the letter as "unclaimed" on June 27, 2011, nearly a month <u>before</u> the hearing. (Hirschkorn Cert., Ex. NN). By simply taking the minute or two necessary to enter the tracking number for its letter (it retained that number, and actually included it on the letter itself, (Hirschkorn Cert., Ex. MM)), on the Postal Service's website in the weeks leading up to the hearing, the Special Board could have confirmed

that the letter had gone unclaimed, and then had ample time to take additional steps to provide Plaintiff with appropriate notice.  In short, having sent its June 7, 2011 letter by such an easily traceable method, the Special Board could have, and should have, taken the minimal additional step of electronically tracking that letter to determine its status.

Nothing in evidentiary record suggests <u>why</u> the Board's June 7, 2011 letter went unclaimed, or that Plaintiff even knew the letter was awaiting her retrieval.  Nevertheless, making a policy argument, Defendants contend that the Court should impose upon Plaintiff an affirmative obligation to claim the letter:  "The fact that Murray-Sims never claimed the letter is immaterial. To hold otherwise, rewards Murrary-Sims for ignoring the [l]etter and invites others to avoid being noticed by leaving their certified mail unclaimed."  (Def. Br., ECF No. 44-7 at 13).  Defendants' proposal would turn the RLA's "due notice" requirement on its head.  The RLA requires the Board to give due notice of its hearing.  It does not require employees to take steps to seek out such notice, or to make it easy for the Board to provide it.  The Board could have quickly determined that Plaintiff never claimed the letter, but neglected to do so.  Based on the foregoing, the Court finds that the Board failed to give Plaintiff due notice of the July 25, 2011 hearing and, in so doing, violated 45 U.S.C § 153(First)(j).  The Court therefore denies Defendants' motion for summary judgment with regard to Plaintiff's "due notice" claim and, instead, grants summary judgment on that claim in Plaintiff's favor.[9]  The Court will therefore vacate the Special Board's February 8,

---

[9] The Court is aware that, while Defendants moved for summary judgment, Plaintiff did not cross-move.  Nevertheless, the United States Court of Appeals for the Third Circuit has held that courts may grant summary judgment sua sponte in certain narrowly defined circumstances.  In <u>Gibson v. Mayor & Council of Wilmington</u>, 355 F.3d 215, 224 (3d Cir. 2004), the Third Circuit found that district courts may enter summary judgment in favor of a non-moving party where (1) the evidentiary record is fully developed; (2) the moving party would not suffer prejudice (i.e., by a lack of notice that the court may enter summary judgment on the issue in question); and (3) the court is deciding a purely legal issue.  <u>Id.</u>  Each of those elements are satisfied here.  Indeed, in filing their motion, Defendants themselves represented that the evidentiary record was complete

2012 award, (Hirschkorn Cert., Ex. LL), and remand consideration of Plaintiff's termination to the

Special Board for a hearing on due notice[10] to Plaintiff.  Finally, as the Court has determined that

summary judgment is appropriate with regard to this claim, the Court need not reach Plaintiff's

other arguments regarding the propriety of the Special Board's hearing (i.e., that the RLA required

the Special Board to ensure her attendance, rather than just provide her with notice).

### b.     Plaintiff's Claims Under the New Jersey Law Against Discrimination

In the Second Count of her Second Amended Complaint, Plaintiff asserts claims under the

New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. §10:5-1, et. seq.  (ECF No. 32-1,

¶¶ 38-53) for both intentional discrimination (also known as "disparate treatment") and for the

creation of a hostile work environment.  (Id.).  While included within the same Count, those causes

of action are distinct and the Court will address each in turn.

### i.     Plaintiff's "Disparate Treatment" Claim

"Disparate treatment claims under the NJLAD are evaluated using the familiar framework

set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 807, 93 S. Ct. 1817, 36 L. Ed. 2d

668 (1973)."  Kimber-Anderson v. City of Newark, 502 F. App'x 210, 212 (3d Cir. 2012).

"Following that framework the plaintiff must first come forward with sufficient evidence to

---

and that it would be appropriate for the Court to enter summary judgment on the purely legal issue
of whether the Board afforded Plaintiff "due notice" of the July 25, 2011 hearing as required under
the RLA.  Indeed, Defendants have filed four substantive briefs in the context of their motion, each
of which has addressed this legal issue.  (ECF Nos. 44-7, 54, 58, 63).  Defendants certainly,
therefore, "'had reason to believe the court might reach the issue and received a fair opportunity
to put [their] best foot forward.'"  Gibson, 355 F.3d at 224 (internal citation omitted).  To proceed
to trial on this claim because Plaintiff did not cross-move for summary judgment would elevate
form over substance and constitute an egregious waste of the parties' and the Court's resources.

[10] The Court will not prescribe any specific, future steps that the Special Board would have to take
to provide Plaintiff with the "due notice" required under the RLA.  That theoretical question is
simply not before the Court in this matter.  To eliminate any doubt, however, the Court strongly
suggests that the Special Board endeavor to provide Plaintiff with actual notice of its hearing.

constitute a prima facie case of discrimination." Id. (citing Dixon v. Rutgers, The State Univ. of New Jersey, 110 N.J. 432, 541 A.2d 1046, 1051 (N.J. 1988)).

To establish a prima facie case, a plaintiff must demonstrate "that she belongs to a protected class, that she was performing her job at a level that met her employer's legitimate expectations, that she suffered an adverse employment action, and that others not within that protected class did not suffer similar adverse employment actions." Id. (citing El-Sioufi v. St. Peter's Univ. Hosp., 382 N.J. Super. 145, 887 A.2d 1170, 1182 (N.J. Super. Ct. App. Div. 2005)).  The Court notes that, when determining whether a plaintiff has established a prima facie case of racial discrimination, it must focus on whether Plaintiff has proffered evidence suggesting that he/she was treated differently than similarly situated employees of a different race.  See, e.g., Didier v. Dow Jones Co., No. 13-176 (FLW), 2014 U.S. Dist. LEXIS 114289, *20 (D.N.J. Aug. 15, 2014) (quoting Doe v. C.A.R.S. Prot. Plus, Inc., 527 F.3d 358, 366 (3d Cir. 2008) ("Evidence of discrimination is commonly presented in the form of evidence of disparate treatment, 'whereby a plaintiff shows that [he or she] was treated less favorably than similarly situated employees' of a different race.")); Aurelio v. Bd. of Educ., No. 06-3146 (JLL), 2009 U.S. Dist. LEXIS 52759, *8 (D.N.J. June 23, 2009) (citing Geldreich v. American Cyanimid Co., 299 N.J. Super. 478, 499, 691 A.2d 423 (App. Div. 1997) ("To establish a prima facie case of discrimination under the NJ LAD, a plaintiff must demonstrate that . . . similarly situated persons outside his or her protected group were treated more favorably giving rise to an inference of discrimination.").  For the purposes of this analysis, "'to be deemed "similarly-situated," the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or their employer's treatment of

them for it.'" Geaney v. Computer Scis. Corp., No. 03-2945 (WGB), 2005 U.S. Dist. LEXIS 47323, *12 (D.N.J. June 3, 2005) (quoting Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992)).  Indeed, "[i]n the context of discrimination cases, a 'similarly situated' person 'must be similarly situated in all material respects.'"  Devine v. Prudential Ins. Co. of Am., No. 03-3971 (FLW), 2007 U.S. Dist. LEXIS 46856, *63-64 (D.N.J. June 27, 2007) (quoting Shumway v. United Parcel Service, Inc., 118 F.3d 60, 64 (2d Cir. 1997)).

"If a plaintiff is able to establish a prima facie case of discrimination, the burden then shifts to the employer to demonstrate that there was a legitimate, non-discriminatory purpose for the actions taken." Kimber-Anderson, 502 F. App'x at 212; Bergen Commer. Bank v. Sisler, 157 N.J. 188, 210 (N.J. 1999).  At that point, the law applies a presumption of discrimination, which the employer may rebut by presenting "clear and convincing evidence that it would have made the same decision in the absence of discrimination."  Price Waterhouse v. Hopkins, 490 U.S. 228, 252-53 (1989).  If the employer is able to proffer such evidence, the presumption of discrimination disappears. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993).  At that point, the burden of production shifts back to the employee, who must demonstrate, by a preponderance of the evidence, that the employer's allegedly non-discriminatory reason(s) for its actions were pretextual.  Bergen Commercial Bank, supra, 157 N.J. at 211.  In determining whether the employer's non-discriminatory reasons are, in fact, pretextual, "the fact-finder is required to consider the employee's performance or other qualities in light of the employer's subjective standards, including worth ethic.  In that respect, the employer's subjective decision-making may be sustained even if unfair." Visik v. Fowler, 173 N.J. 1, 21 (2002).

The Court notes that, "[a]lthough the burden of production shifts throughout the process, the employee retains the burden of proof at all phases and must prove that the adverse employment

action was caused by purposeful or intentional discrimination." <u>Bergen Commer. Bank,</u> 157 N.J. at 211 (quoting <u>Tex. Dep't of Cmty. Affairs v. Burdine,</u> 450 U.S. 248, 256 (1981)).

By the Court's count, and as set forth in Section II(c) above, Plaintiff has identified eleven specific instances of intentional discrimination in support of her disparate treatment claim. Defendants argue that Plaintiff has failed to establish a prima facie case of discrimination with regard to any of them.  (Def. Br., ECF No. 44-7, at 16-29).  The Court will address each of those alleged instances in turn.[11]  The Court observes that, in opposition to Defendants' motion for summary judgment on Plaintiff's discrimination claims (both disparate impact and hostile work environment), Plaintiff made a total of <u>six</u> citations to the evidentiary record (despite describing eleven allegedly discriminatory events).  Once again, the Court notes that it is the parties' responsibility to review the record and identify relevant evidence.  "The Court's role in deciding this motion is not to engage on a scavenger hunt or litigate Plaintiff's case."  <u>Berridge v. Nalco Co.,</u> No. 10-3219 (JHR), 2013 U.S. Dist. LEXIS 88653, *14 (D.N.J. June 25, 2013).  "'Judges are not like pigs, hunting for truffles buried in the record.'"  <u>Doeblers' Pa. Hybrids, Inc. v. Doebler,</u> 442 F.3d 812, 820 (3d Cir. 2006) (quoting <u>Albrechtsen v. Board of Regents of University of Wisconsin System,</u> 309 F.3d 433, 436 (7th Cir. 2002)).

## A.    <u>Alleged Instance 1 – Plaintiff's Training</u>

Plaintiff alleges that, during her 28-day training period with NJ Transit, instructor Allen Antell repeatedly approached Plaintiff, asked her questions and raised his voice when addressing her, ostensibly because Plaintiff's eyes were closed and Mr. Antell believed she was sleeping.

---

[11] The Court notes Defendants' argument that several of the instances of discrimination Plaintiff alleges fall outside of NJLAD's statute of limitations.  (Def. Br., ECF No. 44-7 at 16-18, 26-29).  For the purposes of this motion, the Court assumes, <u>without deciding</u>, that none of Plaintiff's claims are time-barred.  The Court will also assume, without deciding, that NJ Transit took some adverse employment action against Plaintiff in each instance.

(Hirschkorn Cert., Ex. A at 55:18-56:3; 68:5-12).  Plaintiff contends that Antell's conduct was a form of racial discrimination.

Plaintiff has not, however, proffered any evidence regarding how Mr. Antell treated similarly situated employees (i.e., other trainees who sat with their eyes closed) outside of Plaintiff's protected class, or any other evidence suggesting that Mr Antell's conduct was racially motivated.  Plaintiff has therefore failed to make a prima facie case of disparate treatment regarding her training experiences.

### B.  <u>Alleged Instance 2 – Failing Grades on Map Tests</u>

Plaintiff alleges that she was required to draw certain maps as part of the testing process for becoming an assistant conductor, (<u>id.</u> at 66:4-6), and that NJ Transit employee Pat Carroll repeatedly awarded Plaintiff failing grades with regard to those maps.  (<u>Id.</u> at 66:9-11).  While Plaintiff argues that Ms. Carroll was motivated by some racial animus, Plaintiff has not directed the Court to any evidence in the record regarding how Ms. Carroll scored similarly situated employees outside of Plaintiff's protected class.  Plaintiff has therefore failed to make a prima facie case of disparate treatment regarding Ms. Carroll's grading practices.

### C.  <u>Alleged Instance 3 – Reprimand Regarding Punctuality</u>

Plaintiff argues that Pat Carroll engaged in racial discrimination when Ms. Carroll yelled at Plaintiff (who was setting up inside the train) for not being out on the platform "ten minutes prior" to departure, despite the fact that the "conductor" was "two cars up, eating."  (<u>Id.</u> at 66:22-67:8).  In opposing summary judgment, Plaintiff has not cited to any evidence of that conductor's race.  Moreover, while Plaintiff was employed as an Assistant Conductor, (<u>id.</u> at 12:18-20), she complains that Ms. Carroll treated her differently than a full Conductor.  Plaintiff has failed to identify any evidence establishing that she and the unnamed conductor were "similarly situated",

or that the conductor was not also a member of Plaintiff's protected class. She has, therefore, failed to establish a prima facie case of discrimination in connection with this issue.

### D.       Alleged Instance 4 – Reprimand Regarding Plaintiff's Uniform

Plaintiff also contends that Pat Carroll discriminated against her by verbally reprimanding Plaintiff regarding the state of her uniform. Specifically, Plaintiff testified that Pat Carroll "came out and talked to [Plaintiff] on the platform in a detailed tone about [Plaintiff] not having [her] tie correct . . . [and for having her hat] tilted to the side." (Id. at 123:22-124:3). In arguing that Ms. Carroll's reprimand was a form of racial discrimination, Plaintiff contends that Caucasian employee William Warwick brought his dog to work on a single occasion. (Id. at 123:11-21).[12] Plaintiff has not identified anything in the record suggesting whether Mr. Warwick was reprimanded or otherwise disciplined for such conduct, or if it is even a violation of any NJ Transit or NORAC rule. Moreover, the Court finds that an employee who is allegedly out-of-uniform is not "similarly situated" to an employee who brings an animal to work for the purposes of a discrimination analysis. As Plaintiff has not cited to evidence of record establishing that she and Mr. Warwick were similarly situated, Plaintiff has failed to make out a prima facie case of disparate treatment in connection with regard to this claim.[13]

---

[12] In her Counter-Statement of Material Facts, Plaintiff states that Mr. Warwick was also "not in uniform" at the time. (ECF No. 48-1 at 33). Plaintiff's contention that Mr. Warwick was "not in uniform" is not supported by the evidence of record. The Court notes that, while Plaintiff has submitted a citation to page 128 of her deposition in support of that contention, neither party supplied that page to the Court and it is therefore not in the record for this motion.

[13] Indeed, in her opposition brief, Plaintiff has not cited any evidence whatsoever with regard to this issue. (Pl Br., ECF No. 48-2, at 37). The Court has gleaned the citations discussed herein from Plaintiff's Counter-Statement of Material Facts.

### E.    Alleged Instance 5 – Discipline Related to the Extra Board

Plaintiff alleges that NJ Transit racially discriminated against her when it disciplined her in connection with her violations of NORAC Operating Rule T (i.e., not answering a Crew Caller's telephone calls) and, in support of that contention, argues that NJ Transit did not discipline William Bennett, a Caucasian Assistant Conductor, for missing assignment calls. (Id. at 117:8-118:23). In support of her claim, Plaintiff argues that she overheard Mr. Bennett bragging about his refusal to answer assignment calls. (Id.). While Plaintiff has identified evidence demonstrating that both she and Mr. Bennett held the same position (Assistant Conductor), she has not cited to any portion of the record establishing that Mr. Bennett was a member of the Extra Board. As noted above, it was Plaintiff's position on the Extra Board, and the additional responsibilities that such an undertaking entailed, that rendered her failure to answer a violation of NORAC Operating Rule T. Without evidence substantiating that Mr. Bennett was also a member of the Extra Board (or, alternatively, that missing an assignment call also constitutes a violation for non-members), Plaintiff has not established that she and Mr. Bennett were "similarly situated" for the purposes of this analysis. Moreover, Plaintiff has not identified any other Assistant Conductors who avoided disciplined for failing to answer Extra Board calls, let alone the dates of such incidents. (Id. at 118:6-9; 115:6-9). Plaintiff has, therefore, failed to make out a prima facie case of disparate treatment with regard to the way that NJ Transit disciplined Plaintiff for violations of NORAC Operating Rule T.

### F.    Alleged Incident 6 – NJ Transit's Audit Process

Plaintiff argues that NJ Transit engaged in racial discrimination when it repeatedly subjected her to the audit process described in Section II(c)(iv), above. (Pl. Br., ECF No. 48-2, at 43). Plaintiff contends, without citation, that "Caucasian employees were not subjected to this

type of treatment." (Id.).  She also claims, again without citation, that "[t]he number of Caucasian employees being subjected to repeated audits was minimal in comparison to Plaintiff." (Id.).  In moving for summary judgment, Defendants presented evidence demonstrating that, in fact, NJ Transit routinely audited more Caucasian Trainmen than African-American Trainmen. (Hirschkorn Cert., Ex. C, Ex. Q, Ex. S, Ex., Ex. V).  Faced with that evidence, Plaintiff responded: "While a larger number of Caucasian employees were cited as being subjected to audits than African-American employees, the frequency by which African-American employees were subject to audits was of a greater percentage." (Id.).  While that statement appears to be self-contradictory, the Court assumes that Plaintiff means that NJ Transit subjected African-American Trainmen to a disproportionately high number of audits, given the relative number of Caucasian and African-American Trainmen in NJ Transit's workforce.  Plaintiff, however, has not cited any evidence in support of that contention, (id.), and Plaintiff's unsupported, conclusory statement is not sufficient to create a genuine issue of material fact.  See, e.g., Ridgewood Bd. of Educ., 172 F.3d at 252.[14]

As Plaintiff has not presented any evidence suggesting that NJ Transit treated her any differently than employees outside of her protected group with regard to the audit process, Plaintiff has failed to establish a prima facie case of disparate treatment on this issue.  Defendants are, therefore, entitled to summary judgment on Plaintiff's claims of intentional discrimination in connection with the audit process.

---

[14] Alternatively, Plaintiff may mean that NJ Transit audited specific, individual African-American employees more frequently than individual employees of different racial groups.  Even if that were the case, however, Plaintiff has not cited any evidence to substantiate such an accusation.

### G.      Alleged Incident 7 – NJ Transit Employee William Avery's Determination that the Paystub Was Fraudulent

Plaintiff contends that Defendant William Avery racially discriminated against her when he concluded that Plaintiff submitted the Paystub to Eerie Lackawanna Credit Union.  (Hirschkorn Cert., Ex. A at 77:11-78:5).  Plaintiff has not proffered any evidence suggesting the existence of a similarly situated employee outside of her protected group, let alone that NJ Transit treated such an employee differently.  Rather, Plaintiff appears to infer that, because Defendant Avery himself is Caucasian, his decision was necessarily discriminatory.  (Pl. Br., ECF No. 48-2, at 44) ("The termination of Plaintiff was based on conjecture and assumptions of a Caucasian employee who had no direct evidence that Plaintiff engaged in wrongdoing.").  Mr. Avery's race is irrelevant to Plaintiff's initial burden of establishing that NJ Transit treated her differently than another, similarly situated employee who is not a member of Plaintiff's protected group.  Plaintiff has not presented any evidence regarding how Mr. Avery treated similarly situated employees outside of Plaintiff's protected group, and Defendants are entitled to summary judgment on this point.

### H.      Alleged Incident 8 – The Level of Discipline Plaintiff Received in Connection With the Paystub

In her second charge of discrimination in connection with the Paystub Incident, Plaintiff argues that NJ Transit punished her more severely than similarly situated, Caucasian employees. Though she did not cite to any evidentiary support in her brief, (Pl. Br., ECF No. 48-2, at 44), the Court notes that Plaintiff testified that, whereas she was terminated for an alleged violation of NORAC Rule D and not reinstated, two Caucasian employees, William Bennett and Robert Broschart were initially terminated for either stealing (Bennett) or dishonesty (Broschart), but were

subsequently reinstated.  (Hirschkorn Cert., Ex. A at 119:5-120:19).  The only competent[15]

evidence in the record regarding NJ Transit's treatment of these employees demonstrates that, in

fact, NJ Transit terminated <u>both</u> of them, without taking steps to reinstate them.  (Hirschkorn Cert.,

Ex. T; Pl. Ex. 8).  With regard to Mr. Broschart, the Special Board (and not NJ Transit) re-instated

Mr. Broschart over NJ Transit's dissent.  (Hirschkorn Cert., Ex. T).  With regard to Mr. Bennett,

Plaintiff's own exhibit establishes that the Special Board upheld NJ Transit's disciplinary decision,

and that Mr. Bennett was <u>not</u> reinstated.  (Pl. Ex. 8).  Plaintiff has, therefore, not provided any

evidentiary basis that might suggest that NJ Transit disciplined her more harshly than Mr.

Broschart or Mr. Bennett.

 In her supplemental letter brief dated July 3, 2014, ECF No. 61), Plaintiff noted that NJ

Transit determined that its employee, Defendant Joseph Meade, among others, violated its policy

against taking company vehicles for personal use, and suspended Mr. Meade for a period of thirty

days.[16]  (ECF No. 61 at 16).  Plaintiff argues that, because NJ Transit suspended Mr. Meade, rather

---

[15] Plaintiff testified that she had no personal knowledge of Mr. Broschart's, disciplinary history, and that her understanding was based on information gleaned from non-specific workplace gossip, ("He was the talk of New Jersey Transit."), and the news.  (Hirschkorn Cert., Ex. A at 120:13-21).  That is inadmissible hearsay under Fed. R. Evid. 802.  Nothing in the record provides any foundation for Plaintiff's statements regarding Mr. Bennett's disciplinary history.

[16] In support of this statement, Plaintiff cited to an article on the website www.northjersey.com. Though Plaintiff did not provide a copy of that article, and provided the incorrect web address in her citation, the Court was able to locate the article at http://www.northjersey.com/news/nj-transit-disciplines-10-workers-after-using-gps-to-root-out-fraud-waste-and-abuse-1.1009385.  While the article itself is hearsay, certain of the information regarding Mr. Meade is expressly attributed to a specific NJ Transit spokesperson and would therefore not constitute hearsay if offered directly at trial.  Fed. R. Evid. 801(d)(2).  Moreover, while the Court is certainly mindful of the prohibitions against utilizing the findings of any independent, internet-based research in judicial rulings, the Court finds that such prohibitions are not implicated here.  While Plaintiff failed to correctly cite the article in question, she did provide the Court with its source (NorthJersey.com), date (May 5, 2014) and approximate title.  (Pl. Br., ECF No. 61, at 16).  The Court used that information to locate the article Plaintiff described in her brief.  In the Court's view, this situation is no different than one in which a litigant provides the Court with an accurate case name but an incorrect citation to the relevant legal reporter.  Moreover, while Defendants responded to Plaintiff's supplemental

than firing him, that disciplinary decision provides evidence that NJ Transit discriminated against Plaintiff on the basis of race.  (Id. at 16-17).  Plaintiff's argument fails for multiple reasons.  First, and most fundamentally, Plaintiff has not pointed to any evidence in the record establishing Mr. Meade's race.  Second, despite Plaintiff's efforts to label Mr. Meade's behavior as "fraudulent", (ECF No. 61 at 16-17) (ostensibly based solely the news reporter's statement that the purpose of the NJ Transit initiative that resulted in Mr. Meade's suspension was intended to eliminate fraud, waste and abuse), Mr. Meade was suspended for violating a company vehicle policy.  Nothing in the record provides any details regarding Mr. Meade's alleged conduct or suggests that his conduct was, in fact, fraudulent, or otherwise similar to that which Plaintiff was accused of doing.

With regard to Messrs. Broschart and Bennett, Plaintiff has not presented competent evidence suggesting that NJ Transit treated her differently than those employees.  With regard to Mr. Meade, Plaintiff has not cited any evidence establishing (1) that Mr. Meade falls outside of her protected group; or (2) that she and Mr. Meade were similarly situated (i.e., that NJ Transit disciplined them for equivalent violations).  Plaintiff has therefore failed to make out a prima facie case of disparate treatment in connection with her termination and Defendants are entitled to summary judgment on this point.

## I.  Alleged Incident 9 – Requirement That Plaintiff Report for a Medical Examination

As discussed in Section II(c)(vi), above, NJ Transit required Plaintiff to report to its Medical Services Department in connection with a prolonged absence from work.  Plaintiff contends that, because NJ Transit did not require Caucasian employees to appear for similar examinations, the employer has therefore discriminated against her based on her race.  (Pl. Br,

---

submission, they did not challenge the genuineness of that article in any way.  (See generally Def. Br., ECF No. 63).

ECF No. 48-2, at 42).  While Plaintiff did not cite any support for that argument in her brief, (id.), it appears that Plaintiff may be basing that contention on her recollection of overhearing various unnamed, Caucasian employees bragging about not being required to report for medical evaluations.  (Hirschkorn Cert., Ex. A at 92:1-3).  Plaintiff has not provided any elaboration regarding what she overheard (i.e., specific instances of bragging, details of the Caucasian employees' situation – or even their names), either at her deposition, (id. at 92:4-6), or in the record for this motion.

First, the vague "bragging" upon which Plaintiff bases her argument is inadmissible hearsay.  Plaintiff does not know who made the statements at issue (or the circumstances under which they were made), and it is therefore impossible to determine if any exception to the hearsay rule might apply.  Second, even if this "bragging" was admissible, it would not advance Plaintiff's cause.  Without any evidence regarding the details of the braggarts' individual situations (i.e., the length of their sick leave, etc.), Plaintiff cannot demonstrate that they were "similarly situated" for the purposes of this analysis.  For instance, if the braggarts were on leave for short periods of time, and therefore did not trigger the mandatory examination provision of NJ Transit's medical policy, those employers would clearly not be similarly situated.  Plaintiff has failed to establish a prima facie case of disparate treatment regarding NJ Transit's requirement that Plaintiff report for a medical examination.

**J.     Alleged Incident 10 – NJ Transit Employee Joseph Meade Did Not Personally Meet With Plaintiff**

Though not cited in her brief, Plaintiff testified as to her belief that Defendant Joseph Meade discriminated against her by not personally meeting with her to discuss Plaintiff's issues with fellow employee Pat Carroll.  (Hirschkorn Cert., Ex. A at 70:14-71:19, 76:8-12).  Plaintiff testified that, although she attempted to make appointments to meet with Mr. Meade, he referred

her to other supervisors, including Angel Soto and Rita Whitley.  (Id.).  Plaintiff has not, however, presented any evidence regarding how Mr. Meade responded to meeting requests from any other employees, let alone those who were both "similarly situated" to Plaintiff and outside of Plaintiff's protected group.  Plaintiff has failed to establish a prima facie case of disparate treatment on this point and Defendants are entitled to summary judgment.

### K.      Alleged Incident 11 – NJ Transit Denied Plaintiff's Requests for Leave Under the Family Medical Leave Act

Finally, Plaintiff contends that NJ Transit, through Defendant Joseph Meade, discriminated against her by denying her requests for leave under the Family Medical Leave Act.  (Id. at 71:18-73:16).  Plaintiff has not provided any evidence setting forth the details of those denials (i.e., the circumstances that led her to apply for leave or NJ Transit's rationale for denial), let alone any evidence suggesting how NJ Transit processed other, "similarly situated" employees' applications for leave.  Plaintiff has failed to establish a prima facie case of disparate treatment on this point.

### ii.      Plaintiff's "Hostile Work Environment" Claim

In order to establish a claim of hostile work environment under the NJLAD, a plaintiff must demonstrate that the conduct he/she complains of (1) would not have occurred but for the employee's protected status; and that (2) the conduct was severe or pervasive enough to make; (3) a reasonable individual of the same protected class believe that; (4) the conditions of his/her employment have been altered and that the working environment is hostile or abusive.  Lehmann v. Toys R. Us, 132 N.J. 587, 603-04 (N.J. 1993).  As the NJLAD is not a statute based on intent, and its main purpose is to eliminate discrimination, plaintiffs seeking to demonstrate a hostile work environment are not required to show that the employer's discrimination or harassment was intentional.  Id. at 604-05.

Under the first element of this four-prong test, Plaintiff must show, by a preponderance of the evidence, that Defendants would not have subjected her to certain conduct or conditions if not for Plaintiff's race. Id. at 604. If she is able to meet that burden, Plaintiff must then demonstrate that Defendants' allegedly objectionable conduct was sufficiently pervasive or severe. Id. To determine what conduct qualifies as "severe or pervasive" under New Jersey law, courts look to the other elements of a hostile work environment claim and consider whether a reasonable person of the same protected class would believe that his/her employment conditions have been altered to such an extent that his/her work environment may be considered abusive or hostile. Id. In Lehman, the New Jersey Supreme Court found that the severe or pervasive element focuses on the employer's alleged conduct and not a plaintiff's actual injury. Id. at 609-10. When evaluating the third element of this test, the Court must take an objective view of whether a reasonable person of the same protected status would believe a hostile work environment to exist. Id. at 612.

In determining whether a hostile work environment exists, Courts must examine the totality of a plaintiff's work environment. Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993). In conducting that analysis, courts regularly consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. While the plaintiff must show that the unwelcome conduct was "sufficiently severe or pervasive to alter the conditions of employment and create an intimidating, hostile, or offensive working environment," he/she is not required to demonstrate that the conduct occurred on a regular basis. Lehmann supra, 132 N.J. at 603. For instance, in Taylor v. Metzger, 152 N.J. 490,508 (N.J. 1998), the New Jersey Supreme Court found that, when a Sheriff called an African-American officer a "jungle bunny," evidence of that single racial epithet created a question of material fact, sufficient to withstand a motion for

42

summary judgment, as to whether the employer had created hostile work environment.  The Court notes, however, that while a single incident of harassment <u>may</u> satisfy the "severe or pervasive" standard, it is rarely the case that a reasonable person would find a single incident sufficient to create a hostile work environment. <u>Lehmann</u>, 132 N.J. at 606-07. Courts often find that "the required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct." <u>Ellison v. Brady</u>, 924 F.2d 872, 878 (9th Cir. 1991).

Here, Plaintiff has not proffered <u>any</u> competent evidence, let alone evidence sufficient to create a material issue of fact, that Defendants engaged in the allegedly objectionable conduct at issue because of her race.  Plaintiff has simply referred generally to a series of instances, described in detail in Section V(b)(i), above, and concluded, without citation, that they were necessarily driven by some racial animus.  (Pl. Br., ECF No. 48-2, at 41) ("The Plaintiff has been treated differently and negatively based on race.  There has also been the creation of a hostile work environment.").  The Court has already analyzed each of those alleged incidents of discrimination, and concluded that Plaintiff failed to cite any competent evidence that Defendants treated her differently than similarly situated, non-African American employees.  <u>See generally</u> Section V(b)(i), <u>supra</u>.  As Plaintiff has not presented the Court with any other evidence suggesting that Defendants took any of the actions at issue based on Plaintiff's race, Plaintiff has not established even the first element of her hostile work environment claim.  Defendants are therefore entitled to summary judgment with regard to this cause of action.

### c.      **Plaintiff's Common Law Conspiracy Claim**

In order to establish a conspiracy claim, a plaintiff must prove the following elements:  "(1) a combination of two or more persons; (2) a real agreement or confederation with a common design; (3) the existence of an unlawful purpose, or of a lawful purpose to be achieved by unlawful

means; and (4) proof of special damages." Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C., 331 F.3d 406, 414 (3d Cir. 2003) (citing Naylor v. Harkins, 27 N.J. Super. 594, (N.J.Super.Ct.Ch.Div.1953).   Essentially, the plaintiff is required to bring forth direct or circumstantial evidence that shows "two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." Morgan v. Union County Bd. of Chosen Freeholders, 268 N.J. Super. 337, 364 (App. Div.1993).

In order for a plaintiff to bring a civil conspiracy claim, the defendant must have committed an act that would be actionable even without the conspiracy.  Middlesex Concrete Products, & Excavating Corp v. Carteret Indus. Ass'n, 37 N.J. 507, 516 (N.J. 1962); Eli Lilly and Co. v. Roussel Corp., 23 F. Supp.2d 460, 497 (D.N.J. July 7, 1998).  The actionable element in a claim for conspiracy is the tort that the defendants agreed to perpetrate and subsequently committed. Landriani v. Lake Mohawk Country Club, 26 N.J. Super. 157, 159 (App. Div. 1953).  Because a civil conspiracy claim is essentially a tort action, the plaintiff must additionally demonstrate, "(1) an overt act of one or more of the conspirators in furtherance of the conspiracy; and (2) consequential damage to the rights of another, of which the overt act is the proximate cause." Farris v. County of Camden, 61 F. Supp. 2d 307, 330 (D.N.J.1999).  To prevail on a claim of conspiracy, "[t]he plaintiff need not provide direct evidence of the agreement between the conspirators; it is enough that it could be circumstantially inferred from the facts that the conspirators had reached an understanding." Farris v. County of Camden, 61 F. Supp. 2d 307, 330 (D.N.J.1999).

Here, Plaintiff alleges that NJ Transit and former defendant Eerie Lackawanna Credit Union (through its employee, Henry Slootmaker) "conspired against [her] with the goal of aiding [NJ Transit] in removing [Plaintiff] from employment." (Sec. Am. Compl., ECF No. 32-1, ¶ 63). Put simply, Plaintiff has not identified any evidence suggesting that those parties had any sort of agreement or understanding to jeopardize Plaintiff's employment. Indeed, the record reflects that Mr. Slootmaker had not previously discussed Plaintiff with any NJ Transit employee prior to the November 19, 2010 communication in which he confronted NJ Transit employee Patrice Manning about the Paystub. (Hirschkorn Cert., Ex. DD at 6). The record also reflects that Defendant William Avery, the person at NJ Transit who examined the Paystub and determined that it was fraudulent, thereby commencing the process that eventually led to Plaintiff's termination, did not even know Plaintiff at the time. (Hirschkorn Cert., Ex. GG at 47:19).

In arguing that summary judgment on her conspiracy claim would be inappropriate, Plaintiff makes only a single citation to the record, (See Pl. Br., ECF No. 48-2 at 45-48) (demonstrating that Mr. Slootmaker participated in Plaintiff's initial hearing by telephone, a fact that is neither disputed nor material in the context of this claim). Plaintiff summarily contends that "[a] jury looking at the actions taken against Plaintiff where there was no direct evidence that she falsified a pay stub and where the allegation was the result of double hearsay could very easily find that the act of conspiracy is evident from the facts of this case." (Id. at 48). This Court disagrees, as Plaintiff's argument fails in two critical respects. First, Plaintiff has not cited to any portions of the record in support of that statement, let alone established how a factfinder might infer the existence of a conspiracy from such evidence. (Id.). Plaintiff has, therefore, failed to carry her burden in opposing this portion of Defendants' motion. Ridgewood Bd. of Educ., 172 F.3d at 252 ("Once the moving party points to evidence demonstrating no issue of material fact

exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor.  Speculation and conclusory allegations do not satisfy this duty.").  Second, even if the Court were to undertake Plaintiff's burden itself, and somehow determine that Plaintiff was referring to Defendant William Avery's reliance on information obtained from Eerie Lackawanna Credit Union employee Henry Slootmaker, the record would still be devoid of any evidence of a conspiracy.  Mr. Avery independently concluded that the Paystub was not authentic, after realizing that the check number and year-to-date gross wages listed were erroneously high and that the number of remaining vacation days listed exceeded the number that Plaintiff actually had left.  (Hirschkorn Cert., Ex. GG at at 21:5-23, 30:10-23).  The fact that Mr. Avery relied on Mr. Slootmaker's representation that Plaintiff submitted the Paystub when applying for a loan, (id. at 44:6-45:1), is not evidence of a conspiracy.  Indeed, Mr. Slootmaker would necessarily be one of only two people with direct, personal knowledge of how he received the Paystub (the other being the person who gave it to him).  The record indicates that Mr. Slootmaker brought the Paystub to NJ Transit's attention, (Hirschkorn Cert., Ex. DD at 4), and that Mr. Avery later inquired about how Slootmaker obtained that document.  (Hirschkorn Cert., Ex. II at 5).  Those facts cannot support a reasonable inference that NJ Transit and Eerie Lackawanna Credit Union had reached some understanding aimed at ending Plaintiff's employment.

As Plaintiff has not proffered any evidence that NJ Transit and Eerie Lackawanna Credit Union were "acting in concert", she has failed to establish a necessary element of her conspiracy claim.  Morgan, 268 N.J. Super. at 364; Morganroth & Morganroth, 331 F.3d at 414 (plaintiff must provide evidence of a "real agreement or confederation with a common design").  Defendants are

therefore entitled to summary judgment with regard to the Third Count of Plaintiff's Second Amended Complaint.

## VI.    **CONCLUSION**

Based on the foregoing, Defendants' Motion for Summary Judgment, (ECF No. 44) is **GRANTED IN PART AND DENIED IN PART**.  Specifically, the Court grants summary judgment in favor of Defendants with regard to the portion of the First Count of Plaintiff's Second Amended Complaint alleging a violation of Plaintiff's right to due process in connection with Henry Slootmaker's telephonic testimony at the Initial Hearing.  The Court also grants summary judgment in favor of Defendants with regard to the entirety of the Second and Third Counts of Plaintiff's Second Amended Complaint.  Finally, the Court sua sponte grants summary judgment in Plaintiff's favor with regard to the "due notice" claim set forth in the First Count of her Second Amended Complaint.  The Court will therefore vacate the Special Board's February 8, 2012 award, (Hirschkorn Cert., Ex. LL), and remand consideration of Plaintiff's termination to the Special Board for a hearing on due notice to Plaintiff.  An appropriate form of Order accompanies this Opinion.


**s/ Joseph A. Dickson**
**Joseph A. Dickson**
**United States Magistrate Judge**